## MEYERS v. CARUTHERS.

No. 10975—Opinion Filed June 14, 1921.

Rehearing Denied Aug. 31, 1921.

Application to File 2nd Petition for Rehearing Denied Sept. 20, 1921.

(Syllabus.)

1. **Trial—Taking Case from Jury—Demurrer to Evidence—Direction of Verdict.**

Under the procedure and practice in this state in trials by jury, it is the well-established and settled law that, even though the testimony be undisputed, it should be so convincing that all reasonable men must draw the same conclusion from the facts proven, before the court is authorized to sustain a demurrer to the evidence or direct a verdict.

2. **Appeal and Error—Review—Questions of Fact—Verdict—Evidence.**

In a civil action, triable to the jury, where there is competent evidence reasonably tending to support the verdict of the jury, and no prejudicial errors of law are shown in the instructions of the court, or its ruling on law questions presented during the trial, the verdict of the jury will not be disturbed on appeal.

Error from District Court, Tulsa County; Redmond S. Cole, Judge.

Action by B. E. Caruthers against John H. Meyers for damages for personal injuries. Judgment for plaintiff, and defendant brings error. Affirmed.

Randolph, Haver & Shirk and H. M. Gray, for plaintiff in error.

J. P. O'Meara, Chas. E. Bush, A. F. Moss, and Roy F. Ford, for defendant in error.

JOHNSON, J. B. E. Caruthers, as plaintiff, commenced an action against John H. Meyers, as defendant, to recover the sum of $25,000 as damages for personal injuries, and it was tried to a jury, which resulted in a verdict and judgment in the sum of $18,500, to reverse which this proceeding in error has been regularly commenced.

For convenience, the parties will be hereafter referred to as plaintiff and defendant, respectively, as they appeared in the trial court.

The record discloses that the plaintiff was a switchman for the Frisco Railroad, while the defendant was the owner and operator of the Tulsa Planing Mill, an industrial establishment situated on certain trackage of the Frisco Railroad a short distance from the defendant's mill, and across certain railroad tracks of the Frisco was a building belonging to the Bessemer Gas Engine Company. In order to hold the smokestack of his plant in place, the defendant had a wire brace running from a point near the top of the smokestack across the aforesaid Frisco tracks and attached to the comb of the building of the Bessemer Gas Engine Company. While switching on the tracks aforesaid, the plaintiff fell from the top of a box car, and brought suit against the defendant on the theory that his fall was occasioned by his coming in contact with the above mentioned guy wire. The dominant issue in the case was whether the plaintiff had come in contact or could have come in contact with the wire, and whether that was the cause of his injury.

The plaintiff alleged in his petition as follows:

"That on the said second day of April, 1911, and for a long time prior thereto, the said defendant, John H. Meyers, owned and controlled a certain large frame building located a few feet south of the southern track of the Frisco Railroad Company at a point thereon immediately east of Frankfort avenue in the city of Tulsa, Oklahoma, and that on the north extremity of said building there had been erected and maintained for a long time prior to said date a smokestack thereon which was approximately 40 feet in height, and that said defendant, in order to secure and hold the said

smokestack as aforesaid attached thereto, a long time prior to the second day of April, 1911, certain guy wire about 16 or 18 feet above the surface or level of the railroad track nearest to the said building owned by the said defendant; and that a long time prior to said Bessemer Engine Company owned and controlled a certain sheet iron building which was located in a northwesterly direction from the said building owned by the said defendant herein, being about 30 or 40 feet from the building owned by said defendant; that the said defendant herein, by and with the knowledge and consent of the Bessemer Gas Engine Company, attached one of the guy wires to said smokestack as aforesaid to the building owned by the said Bessemer Gas Engine Company, and which wire ran over and crossed the said Frisco Railroad track, was located between the buildings owned by the defendant herein and the Bessemer Gas Engine Company; that said guy wire was a strong, heavy wire, firmly and securely attached to the said smokestack and to the building of the Bessemer Gas Engine Company, and was approximately 18 feet above the level of the track and surface of the railroad bed of said railroad company, and was not of sufficient height to permit persons riding on box cars to clear said wire; and that said conditions as aforesaid. and all of them existed for a long time prior thereto and that said conditions, and all of them were known to the defendant or could have been discovered by said defendant by the exercise of ordinary care.

"That heretofore, to wit, on the second day of April, 1911, at about the hour of 9:30 o'clock of said day, plaintiff, in the discharge of his duties as a switchman of the said Frisco Railroad Company, was struck by said wire and thrown from the top of the said box car on which he was riding at the time against the side of the building of the said Bessemer Gas Engine Company, and under the wheels of the said box car on which he was riding, and as a direct and proximate result thereof was painfully, permanently and seriously injured as hereinafter alleged."

The defendant's answer consisted of a general denial, and the charge of contributory negligence against the plaintiff was as follows:

"Further answering and for further defense, the defendant, J. H. Meyers, specifically denies that he was negligent, and alleges that the injuries, if any were sustained by the plaintiff, were directly and proximately caused by his own negligence and want of care, together with the negligence and want of care of his employer, the St. Louis & San Francisco Railroad Company, its agents and coemployes, among other things, to wit: That said B. E. Caruthers permitted himself to become overbalanced by reason of the strong wind that was blowing at the time, and by reason of the carelessness and negligence of the plaintiff and the St. Louis & San Francisco Railroad Company in handling the car on which the plaintiff was riding, whereby he fell to the ground and received the injuries alleged to have been sustained.

"Further answering, and for further defense, the defendant, J. H. Meyers, avers, that if said B. E. Caruthers was injured at the time and place alleged in the petition, which this defendant does not admit, that the negligence and want of care of the said plaintiff directly and proximately contributed thereto, without which said accident would not have happened."

The defendant's petition in error contains three specifications of error, which are as follows:

"1st. The said district court erred in overruling the motion of this plaintiff in error for a new trial.

"2nd. Said court erred in overruling the demurrer to the evidence of the plaintiff in said district court.

"3d. Said court erred in giving to the jury instructions Nos. 4, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15. and 16, and each of them, over the exceptions of the defendant in the trial court."

Counsel for defendant discusses the first two assignments of error together in their brief, concerning which they say:

"The assignment of error in overruling motion for new trial which raises the question that the verdict is contrary to law, and the assignment of error in overruling the demurrer to the evidence, both present the controlling proposition that where the testimony of a witness has positively contradicted all the physical facts, neither the court nor the jury can be permitted to credit it."

We will likewise consider the two assignments of error together.

The rule announced by this court is that:

"Where, in a trial of a cause, the defendant demurs to the evidence of the plaintiff, such demurrer admits, for the purpose of the demurrer, all of the material facts and evidence, including legal presumption and admission either in the pleadings or otherwise, in the most favorable light towards the plaintiff." Bean v. Rumrill. 69 Oklahoma, 172 Pac. 452; Helm v. Mickelson, 66 Oklahoma, 170 Pac. 704; Fuss v. Cocannoer, 70 Oklahoma. 172 Pac. 1077; Felt v. Westlake. 68 Oklahoma, 174 Pac. 1041; Smith v. Rockett, 79 Okla. 244, 192 Pac. 691; Singer v. Citizens' Bank of Headrick, 79 Okla. 267. 193 Pac. 41; Boatman v. Coverdale, 80 Okla. 9, 193 Pac. 974.

The record discloses that there was no eyewitness to the accident in which the plaintiff sustained the injuries complained of. The plaintiff testified that he was knocked from the top of the car by the guy

wire of the defendant's smokestack, which was stretched across the railroad track and anchored to the roof of the Bessemer Gas Engine building; that he fell to the ground on the north side of the car on his head, and that in falling his feet struck the building mentioned, but he never remembered anything else until several days thereafter when he came to his senses in the hospital. There was but one witness as to the position of the body of the plaintiff immediately after the accident, and both the testimony of the plaintiff and the testimony of the switchman Young, as to where the plaintiff's body lay upon the ground after the accident, stand uncontradicted by any witness. The testimony of the plaintiff was that the car on which he was riding was going west; the Bessemer Gas Engine Company's building was 15 or 30 feet west of the defendant's building, and across the tracks therefrom. These witnesses testified in detail, as follows:

"Q. Let me get that straight—the Bessemer Gas Engine Company was located north and west of the Tulsa Planing Mill? A. Just a little west. Q. About how many feet would you say north and west? A. I don't know. Q. Well in your best judgment? A. I judge about 15 or 20 feet, maybe west of the planing mill. Q. How far north? A. Probably 30 or 40 feet. Q. Now, then, was there one or two tracks between that and the planing mill? A. There was a switch right at the west side of the Bessemer Gas Engine house, and there was two tracks, that is, the switch, it was coupled up for two tracks."

Further on in his direct testimony, plaintiff gives this version of how the accident happened:

"Q. Tell the directions you would come up. A. We went east up the main track beyond this industrial track and was backing up west to couple onto one car, as well as I can remember, and I got on top and let the brakes off—the brake was on the east end of the car—and walked up to the west end, where I was to couple up on this string of four or five cars right along by the Bessemer Gas Engine house or some eight or ten feet west of them. I went under this wire and I ducked as I went down. Q. Which way were you going when you ducked under this wire? A. I was going west; I ducked as I went under the wire, and the cars were running some four or five miles an hour and thought they was going to hit a little hard so I was standing up close to the end of the car; that was at first, and I stepped back and when I stepped back is when I hit the wire and I was knocked off of the side, the north side of the car. A. What part of your body struck the wire, where did the wire strike you? A. On the side and back of the neck. Q. Was it the right side of

your neck, in the back? A. Yes, sir. Q. Did it make any mark or bruise on the skin there? A. Why, it hurt me all the time I was in the hospital, it felt like there was some kind of a mark; I don't know. Q. Now just tell the jury what, if anything, happened to you when this wire struck you in the back of the neck? A. It just tumbled me off on the side of the car. Q. Which way did you fall? A. On the north side of the car. Q. Did you fall on the ground? A. Yes, sir."

On his cross-examination, the plaintiff testified as follows:

"Q. And you climbed up on the east end of the car and released the brake? A. Yes, sir. Q. Then what did you do? A. I walked up to the west end. Q. The engine pushing the car west? A. Yes, sir. Q. I believe you stated you ducked going under the wire? A. I did. Q. Ducked your head and you went ten or twelve feet beyond it? A. Yes, sir. Q. You thought that the cars were coming together pretty hard and you wanted to brace yourself? A. Yes, sir. Q. Or get away from the place where they would come together, and you took a few steps back? A. Yes, sir. Q. And you ran into the wire? A. Yes, sir. Q. How fast did you walk back, Mr. Caruthers, just ordinarily walking? A. Stepped back just a little fast. Q. How much faster than an ordinary walk? A. Well, I don't know. Q. Do you remember what you testified to in the case of yours against the Bessemer Engine Company last year? A. Yes, sir; I am pretty sure I do. Q. I will ask you whether or not you were asked this question and you answered in this way: 'Mr. Caruthers, stepping back you didn't go back faster than the ordinary walk, did you? A. I was a little quicker. Q. How much faster? A. I don't know. Q. Not very much faster? A. Not much.' Q. Were those questions asked you? A. Yes, sir. Q. And you gave those answers; you took two or three steps back? A. Yes, sir. Q. And came in contact with the wire? A. Yes, sir. Q. You were facing which way when the wire hit you? A. Facing the west. Q. Now with reference to the two cars coming together, when did you hit the wire, before? A. Well, I don't remember whether it was before or not that—before they made the coupling or when I stepped back, but I don't know whether they coupled or not. Q. Don't you remember that you hit the wire just before the coupling was made? A. Well, I remember hitting the wire, but I don't remember when the cars coupled. * * * Q. Just like the refrigerator cars; now you passed under this wire, ten or twelve feet and the cars you were going to couple onto were beyond that? A. They were right along, they were just ten or twelve feet—yes, sir. Q. What time of the day was this? A. About nine thirty; I am pretty sure it was—early in the morning. Q. What was the condition of that refrigerator car that you were on as to the top of it? A. I don't know. Q. Didn't it have a running board? A. Oh, yes. Q. Anything

wrong with that? A. I don't know that there was. Q. Did you walk back on the running board, or did you step off the running board? A. I stepped to the side of the running board. Q. Do you know how far? A. Just right down at the side. Q. About how much force did you hit the wire with, was it just a light tap or was it a severe blow? A. For that part, I don't remember. Q. But you hit it hard enough to knock you off the car? A. Yes, sir. Q. Where did you fall? A. I fell down by the side of the car. Q. Do you know what you hit when you went off the car? A. Why, I hit the ground, I hit the building, the Bessemer Gas Engine Company with my leg, I believe it was. I remember about hitting the building. It seems as though it hit my leg; that is the last I remember. Q. You did hit something going over? Q. Yes, sir. Q. About how many times had you ducked going under this wire? A. Why, any time I was on top of a high car; you had to duck to get under. By the Court: That is not the question; how many times had you ducked? A. I don't know. * * * Q. Now, Mr. Caruthers, I want to ask you about how you happened to fall off the north side of the car. Now this wire ran in a northwesterly and a southeasterly direction across the track, is that true? A. Yes sir. Q. And you were up on this refrigerator car and had gone ten or twelve feet under the wire east? A. Yes, sir. Q. And you stepped back and run into that wire? A. Yes, sir. Q. It hit you on the back of the neck on the side? A. Back and side; yes, sir. * * * Q. How did the wire throw you, to the north of the car? A. Well, I don't know. Q. I believe you said the wire was loose? A. The wire was loose.' Q. When you hit it it would spring back, wouldn't it? * * * Q. You don't remember? How close were you to the west end of the refrigerator car when you started to step back the two or three steps? A. About two feet and a half. Q. About two or two feet and a half from the west end of the car that you were riding on? A. Yes, sir. Q. And you stepped back then the two or three steps and came in contact with the wire? A. Yes, sir. Q. While the car was still moving to the west? A. Yes, sir. Q. And then you stepped back two or three or four quick steps? Mr. Haver: I object to the council leading the witness. The Court: The objection will be sustained. Q. Now, then, do you know how many steps you took back? A. No, I don't know. Mr. Haver: He has already testified that he did know, he told us. The Court: The objection will be sustained. Q. When you went west you ducked under this wire? A. Yes, sir. Q. Now, then, you don't know how many feet you went from the wire west, do you? Mr. Haver: He has already answered that from my question two or three times. Mr. Ford: He said he thought he went about ten or twelve feet; I am asking him if he knows how many feet he went. The Court: He has answered the question; go ahead. A. What was the question? I did not; I don't know exactly. Q. Ten or twelve feet was just your judg-

ment? A. Yes, sir. Q. As to the number of steps you took backward, was just your judgment? A. Yes, sir. Q. All of this happened in 30 seconds, didn't it? A. Something like that. * * * Q. About what rate of speed was this refrigerator car moving west as you passed under the wire? A. Well, I would judge about four or five miles an hour. Q. It appeared to you that it was going too fast to make a safe coupling? A. When I was close to the end of the car. Q. You wanted to get away from that place? A. Yes, sir. * * * Q. What did you step back for? A. For the reason that I thought they were going to hit hard and I stepped back away from the edge of the car to keep from going over the end of the car if the coupling didn't make. Q. What knocked you off of that car? A. The wire."

J. T. Young, called as a witness on behalf of the defendant, having been first duly sworn to testify to the truth, the whole truth and nothing but the truth, was examined in chief by Mr. Campbell, and testified as follows:

"Q. State your name. A. Young, J. T. Young. Q. What is your business, Mr. Young? A. Switchman. Q. For the Frisco? A. No, sir. Q. By whom are you employed? A. The M., O. & G. at Muskogee. Q. Mr. Young, what were you doing during the months of January, February, March, and April, 1911? A. Switching for the Frisco. Q. How long have you been switching for the Frisco? A. Since the 19th of January, 1909. Q. Where were you employed in the early part of 1911? A. Here in Tulsa. Q. In the Tulsa yards? A. Yes, sir. Q. You know the plaintiff, Mr. Caruthers? A. Yes, sir. Q. You remember his accident? A. Yes, sir. Q. Were you working in that crew? A. Yes. sir. Q. Did you see Mr. Caruthers fall? A. No, sir. Q. What attracted your attention to it? A. After we coupled into the cars, I was looking back to get the signal from the foreman, and saw him lying facing, his head was north, with his head north, between the second and third cars from the engine, with his foot on the rail. Q. Between the second and third cars? A. Yes, sir. Q. Do you remember that when the engine backed in on the industrial track it first coupled on to a refrigerator car? A. Yes, sir. Q. That was the second car? A. Yes, sir. Q. Now, was there another car coupled on to the engine at that time? A. Yes, sir; we had brought one from West Tulsa with us. Q. One from West Tulsa? A. Yes, sir. Q. Then there was two cars at that time? A. That made two cars. Q. The train backed further west to couple on to some other cars? A. Yes, sir. Q. Did they make that coupling? A. Yes, sir. Q. Where was Caruthers lying with reference to the east end of the Bessemer Gas Engine house? A. He was lying— Mr. Moss: You mean east or west, Harry? Mr. Campbell: East. A. He wasn't east of the building; he was lying between the main build-

ing and a platform, about four feet from the center of the building; there is a six-foot platform on there; lying about four feet from the door, the way I recall it at this time, and the main building, and there is a platform you know, extendng out from the main building. Q. I don't believe I get your idea. Mr. Young, exactly; now, I understand there was a platform west of the building? A. Yes sir. Q. Is that the platform you have reference to? A. Yes, sir. Q. Where was he lying with reference to the building proper? A. He was lying—the platform extended over the main building—he was lying about four feet from the platform west. Q. That would be four feet from the west end of the main building? A. From the main building, not including the platform. Q. And that was between the second and third cars? A. Yes, sir. Q. That is to say, if I understand you, he was at the east end of that refrigerator car picked up on that track? A. At the west end of that car, but the east end of the three cars. Q. He was at the west end of that refrigerator? A. West end of the second car, but the east end of the third. Q. Had you walked down the track ahead of the engine? A. No, sir. Q. Where were you? A. When we coupled into the car I looked to get the signal from the foreman, to locate him, and then when I located him I saw this boy lying on the ground on the north side of the car. * * *"

Cross-examination by Mr. Moss:

"Q. Was Caruthers' foot fastened under the wheel of the car when you saw him? A. We slacked ahead. Q. The wheel on which he was riding, the wheel on his foot? A. That was the car I last saw him on. Q. It was the wheels of that particular car that had his foot imprisoned wasn't it? A. It was. Q. How far from the end of the car was the wheel under the car which had his foot held? A. How far from the end of the car? Q. Yes. A. I don't know exactly the distance of a standard car; it was a standard car and you can judge; I would think not over two feet, I would think. Q. Then he wasn't between the second and third cars, was he? A. Yes, he was between the second and third cars, he was lying. Q. His foot was further towards the east than his body? A. Yes, sir. He was between the second and third cars, where he fell; he had to go down between this car in order to get down there. Q. Oh, he did. How far west of the wire was Caruthers' body, the main part of his body? A. I judge about twelve or fourteen feet. Q. How far was it from the north side of the car to the south side of the Bessemer Gas Engine Company's building? I am talking about the surface of the car and the surface of the building. A. How far from the north side of the car? Q. Yes. A. To the south side of the building? Q. Yes. A. I don't know. Q. Sufficient distance to admit a body the size of Caruthers'? A. Yes. sir. Q. If there was sufficient distance for him to fall down, it was entirely possible for him to do it,

wasn't it? A. How is that? Mr. Moss: Tha is all. Mr. Campbell: That is all."

It is clear from the foregoing testimony that the engine was pushing two cars when the accident happened; that they were moving to couple and did couple to a third car.

The testimony of the plaintiff is that on that morning they had brought one car with them from West Tulsa; that they backed in west on the industrial track to couple to another car, and that they continued west; that he climbed upon the top of the car to which they coupled and walked to the west end thereof, and that he was standing within two or three feet of the west end of the car, which was moving west at a rate of four or five miles an hour, when he reached and ducked under the wire, and that after he had passed the wire ten or twelve feet he saw the cars were going to hit hard, and might fail to couple and throw him forward between them, to prevent which he stepped backward quickly three or four steps; that the wire struck him on the right side of his neck and knocked him off the car to the north side thereof, and that as he fell his feet or legs struck the building of the Bessemer Gas Engine Company; that he fell on his head and remembered nothing thereafter of the accident.

Mr. Young testified that he was on the engine when the car struck and coupled, and that he looked west to get the signal from the foreman and that he saw the plaintiff lying between the second and third cars with his head and body to the north, and his foot on the rail, and that when he reached him he found the wheel on the plaintiff and the train had to be slacked to get him out.

This constitutes the undisputed testimony and all the testimony concerning the accident.

As before stated, "the first proposition of defendant's counsel is that where the testimony of a witness is positively contradicted by the physical facts, neither the court nor the jury can be permitted to credit it." And concerning the facts in this case, counsel say in their brief:

"The uncontradicted evidence in the instant case shows that plaintiff could not have been injured in the way he says that he was injured. The only evidence as to how the accident happened was that of the plaintiff. His testimony was consistent with itself throughout, but presents impossible conflict with the physical facts."

That proposition and argument of counsel presents the question, Did the testimony of the plaintiff, in connection with the physi-

cal facts shown to exist from his testimony, present any disputed question of fact to be determined by the jury, or were such testimony and physical facts so harmonious as to be without conflict, as to render the question involved, the primary negligence of the defendant, one of law for the court?

The rule has often been announced by this court that in a personal injury action, where negligence of the defendant is charged as a basis of the action, the question whether or not such negligence existed is always a question of fact to be determined by the jury, unless the evidence is so harmonious and free from conflict that all reasonable minds must draw the same conclusion therefrom, in which case it becomes one of law for the court. City of Durant v. Allen et al., 67 Oklahoma, 168 Pac. 205; Rogers et ux. v. O. K. Bus & Baggage Co., 46 Okla. 289, 148 Pac. 837.

The only negligence charged against the defendant was that of maintaining the guy wire across the Frisco tracks in a loose and slack condition and not of sufficient height to permit persons riding on box cars to clear said wire, and that on account of such condition of the wire the defendant was knocked from the box car and injured. This question was fairly and correctly submitted to the jury by the instructions of the court, and the jury rendered a general verdict in favor of the plaintiff.

It developed from the examination of the plaintiff and defendant that they each had testified in other trials to the facts of this accident. This statement is found in the reply brief of counsel for defendant:

"The plaintiff, in his brief, goes outside the record and affirms that this case has been tried five times. He did not state the remainder of the facts, which are that the case was twice tried against the Frisco and twice against the Bessemer Company, and only this one against this defendant. And in the four former trials, in two, Judge Yoemans, of the U. S. District Court, held that the story was too impossible to take the case to the jury, and in the case against the Bessemer Company the jury refused to believe the story of the plaintiff."

So it appears that upon the question of negligence of the defendant reasonable men have failed to draw the same conclusion, hence it would seem that this question was not one of law for the court under the rule, supra, but on the other hand was for the jury under proper instructions of the court, and was for the jury to apply the law to the facts and determine therefrom the proximate cause of the injury.

The second proposition is the error in giving instructions Nos. 4, 6, 7, 8, 10, 11, 12, 13, 14, 15, and 16.

The record discloses that the defendant did not tender or request any instructions, but saved an exception to each paragraph of the instructions given by the court, and counsel argued in their brief the foregoing instructions as given by the court, consisting of 12 paragraphs, all of which we have carefully examined with the result following: No. 4 was upon the burden of proof, and was correct; therefore we find there was no error in giving the same, No. 5 contains a correct definition of what is meant by a preponderance of the evidence, and there was no error in giving the same. No. 6 contained a correct definition of the terms "negligence" and "contributory negligence", and there was no error in giving the same. No. 7 contained a correct definition of the term "ordinary care" as used in the instructions, and there was no error in giving the same. No. 8 correctly defines the term "proximate cause," and there was no error in giving the same. No. 9 informed the jury that one who is in a situation of sudden and imminent danger, without any fault on his part, is not guilty of contributory negligence because he acts upon appearances of danger which did not in fact exist, and because he fails to make the most judicious choice between the expedients which the situation presents for seeking his safety. As we view the record in this case this instruction was upon an abstract proposition of law and stated the rule substantially correct, and the giving of the same was entirely harmless, because there was no testimony in the record tending to show that the plaintiff was guilty of contributory negligence at the time of the injury, for the reason that he was where it was his duty to be, here he had a right to be at the time of the accident, and there is nothing to show that he failed to exercise that degree of care and caution that persons of ordinary prudence, similarly situated, would have done, and while the instructions placed an extra burden upon the plaintiff in thus submitting his case to the jury, it was entirely harmless so far as the defendant was concerned and is a matter of which he cannot complain. Hostettler et al. v. Carter, 73 Oklahoma, 175 Pac. 244; Mayo v. Thede, 73 Oklahoma, 175 Pac. 348. No. 10 correctly stated the law as to joint and several liability of joint tort-feasors as applied to the facts in this case.

No. 11 was a summary of the facts that were necessary to be shown in order to

make the defendant guilty of primary negligence in the matter of maintaining a guy wire to the smokestack; then stating to the jury that his failure so to do would be negligence unless the plaintiff himself was guilty of such want of care as contributed to his own injury. There was no error in giving this instruction of which the defendant can complain. No. 12 made an application of the rules announced in instruction No. 11 to the facts of this case, telling the jury that if the defendant knowingly was guilty of negligence in the way and manner pointed out in instruction No. 11. he would be guilty of negligence. There was no error in giving this instruction. City of Ada v. Smith, 73 Oklahoma, 175 Pac. 924. No. 13 was upon the question of proximate cause, and properly submitted that question for the determination of the jury, and there was no error in giving the same. Nos. 14 and 15 were upon the measure of damages, and were a substantially correct statement of the law as applied to the facts in this case, and there was no error in giving the same. Lusk et al. v. Haley, 75 Okla. 206, 181 Pac. 727. No. 16 was the usual and substantially correct statement of the rule that the jury was the sole judge of the credibility of the witnesses and the weight and value of their testimony, and was properly given.

These instructions, when taken as a whole, and considered together with the other instructions. fairly present the law, and there was no reversible error committed by the trial court in giving the same. Slick Oil Co. v. Coffey et al., 72 Oklahoma, 177 Pac. 915.

The cases of St. Louis & S. F. R. Co. v. Rushing et al., 31 Okla. 231, 120 Pac. 973, and St. Louis & S. F. R. Co. v. Hart, 45 Okla. 659, 146 Pac. 436, involved all the questions that were raised for the consideration of this court in the instant case and were well-considered cases, and the rules announced in these cases have been adhered to by this court ever since. The question of the sufficiency of primary negligence in a personal injury case to take the case to the jury, and the questions of law arising upon the trial upon the admission and rejection of evidence and the instructions to the jury, and that of contributory negligence were involved in this case, and upon the first proposition the rule was thus stated in St. Louis & S. F. R. Co. v. Hart, supra:

"The plaintiff, in a civil cause is not required to prove his cause beyond any reasonable doubt. If he makes it appear to be more probable that the injury came in whole or in part from the acts of negligence alleged than from any other cause, that is sufficient."

In syllabus paragraph 8 of the latter case it was said:

"Section 6005, Rev. Laws Okla. 1910, provides that no judgment shall be set aside on the ground of misdirection of the jury, or the improper admission or rejection of evidence, unless in the opinion of the Supreme Court, after an examination of the entire record, it appears that the error complained of has probably resulted in a miscarriage of justice, or constitutes a violation of a constitutional or statutory right of the aggrieved party."

In the body of the opinion, after discussing the question of negligence and contributory negligence, Mr. Justice Kane, who delivered the opinion, says:

"Whilst the theory of the plaintiff may seem improbable to the court, yet, in the absence of a more plausible explanation of the manner the injury occurred, we do not feel that we would be justified in disturbing the finding of the jury upon that point. The plaintiff himself explained the details of the manner of his injury to the jury with great minuteness. Whilst the explanation seems somewhat involved, very likely it appeared quite clear to the jury, whose peculiar function it is to unravel and harmonize complicated combinations of facts. The plaintiff in a civil cause is not required to prove his cause beyond any reasonable doubt. If he makes it appear to be more probable that the injury came in whole or in part from the negligence alleged than from any other cause, that is sufficient."

Again he says:

"We take it that, if the evidence conclusively shows that such a one deliberately walked in front of a moving train with suicidal intent and was killed, it would be the duty of the courts, trial or appellate, to set aside a verdict in his favor and grant a new trial. As we have seen in the instant case, the evidence of the plaintiff shows that he heard the train before reaching the crossing, but did not know that it was coming toward him until he had got upon the track, whereupon he immediately sought to retrace his steps and return to a place of safety. The evidence also is to the effect that the train was approaching very slowly. about three or four miles an hour, the gait at which a man ordinarily walks. If the plaintiff permitted a train approaching at that gait to run him down and injure him, there being nothing to prevent him from getting out of the way, the court probably would be justified in reversing the verdict in his favor and remanding the cause for a new trial upon the ground that there was no evidence reasonably tending to support the same; but, having arrived at the conclusion that there was sufficient evidence of negligence on the part of the de-

fendant to take the case to the jury on that question, it would seem to follow that it was for the jury to say whether the testimony of the plaintiff as to getting his foot caught between the plank and rail was sufficient explanation of why he did not retire to a place of safety after he discovered that the train was backing toward him to absolve him from the charge of contributory negligence. As we have said before, in this jurisdiction the question of contributory negligence is always for the jury. At most, the only function of the court is to define for the jury the meaning of the term 'contributory negligence' as used in section 6, supra, and instruct them that it is always a question of fact for their determination. In no event is the court authorized to direct a verdict or sustain a demurrer to the evidence upon the ground that it conclusively appears that the plaintiff is guilty of contributory negligence as a matter of law."

It is the universal rule of this court that "in a civil action, triable to the jury where there is complete evidence reasonably tending to support the verdict of the jury and no prejudicial errors of law are shown in the instructions of the court or its rulings on law questions presented during the trial, the verdict and finding of the jury will not be disturbed on appeal." Bunker v. Harding et al., 70 Oklahoma, 174 Pac. 749; Blasdel et al. v. Gower, 70 Oklahoma, 173 Pac. 644; Shawnee National Bank v. Pool, 66 Oklahoma, 167 Pac. 994; Chicago, R. I. & P. Ry. Co. v. Pruitt, 67 Oklahoma, 170 Pac. 1143.

The judgment of the trial court is affirmed.

PITCHFORD, V. C. J., and KANE, MILLER, and KENNAMER, JJ., concur.